# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00140-CV

### A. D., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-21-006966, THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING

## O P I N I O N

A.D. (Mother) appeals from the trial court's decree terminating her parental rights to her son Michael following a bench trial.[1] The trial court found that termination of Mother's parental rights was in Michael's best interest and that Mother constructively abandoned him and failed to comply with the requirements of a court order establishing the actions necessary for her to obtain his return. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O), (b)(2). On appeal, Mother contends that her appointed trial counsel provided ineffective assistance and challenges the legal and factual sufficiency of the trial court's best-interest finding and the findings regarding the two statutory predicate grounds for termination. We will affirm the trial court's termination decree.

---

[1] To protect the child's privacy, we will refer to him by a pseudonym and will refer to family members by their relationships to him. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father's parental rights were also terminated after he signed an affidavit of relinquishment, and he has not appealed the decree.

## BACKGROUND

This case involves the termination of Mother's rights to her son Michael, who was almost one and half years old at the time of termination in March 2023. The affidavit in support of Michael's removal states that the Department of Family and Protective Services ("Department") received a report in October 2021 alleging that Mother tested positive for amphetamines at his birth and was neglectfully supervising him. The hospital staff believed that Parents were both on drugs while at the hospital, and Parents got into an argument requiring hospital security to become involved repeatedly. Approximately one week later, a Department investigator talked with Parents, and Mother stated that she took another drug test and believed that she would test positive for opioids because the hospital prescribed her drugs when she gave birth to Michael. The hospital social worker confirmed that the hospital gave Mother oxycodone during her time at the hospital.

In November 2021, the Department received another complaint alleging neglectful supervision after Parents brought Michael to the hospital. During this visit, Mother repeatedly scratched herself, and Parents asserted that they brought Michael in because he had a fever and because they believed that there were worms or parasites on all three of them; however, the hospital staff did not see any worms or parasites. The hospital staff believed that Parents were using drugs due to their "high energy" and were unable to care for Michael. When the Department responded to the report, a Department employee found Mother passed out on a couch in Michael's hospital room with her arm draped over his face and mouth in a manner that "could have easily suffocated" him, and Mother would not wake up despite repeated efforts to rouse her for several minutes. Following this encounter, the Department took emergency custody of Michael.

2

Under the terms of a temporary order from March 2022, Mother was ordered to submit to random drug tests; participate in a substance abuse assessment with the offices of Outreach Screening, Assessment, and Referral (OSAR) and follow all recommendations made; participate in and successfully complete individual therapy and follow all recommendations made; attend and complete a Nurturing Parenting Program; participate in a psychological evaluation and follow all recommendations made; obtain and maintain a safe and stable home; notify the Department of any change of address or telephone number; successfully complete parent coaching; and provide verification of employment. The order also warned that the failure to submit to drug testing would result in the missed test's being deemed a positive one. A permanency-hearing order from February 2023 incorporated the same requirements listed above but also required Mother to submit to a new OSAR evaluation. The order also specified that Mother did not appear at the hearing.

During the trial, a Department caseworker assigned to this case in November 2022 testified that the Department became involved in this case after developing concerns that Parents were using controlled substances. Further, she testified that after the Department was granted temporary managing conservatorship, Parents were ordered to complete the services and other requirements set out above as part of a reunification plan. Next, the caseworker explained that although Mother submitted to one of the four OSAR referrals made in this case, she did not complete any of the other ordered services. Additionally, the caseworker testified that although Mother did submit to some drug tests, she was not compliant with the testing requirement. Further, the caseworker related that Mother did not communicate with her or the previous caseworker. Although the caseworker acknowledged that Mother did visit Michael, she explained that Mother did not visit consistently, including only ten times following removal

despite a weekly visitation schedule with the last visit on October 3, 2022, nearly five months before the trial date. Further, the caseworker testified that Mother had no more contact with Michael following that date. The caseworker emphasized that she tried to reach Mother by going to her home, calling her, texting her, emailing her, and calling her attorney but that Mother never responded.

Additionally, the caseworker explained that Mother was not present for the trial and that the Department did not know where Mother was living. Further, the caseworker explained that Mother gave birth to another child in November 2022, that the Department received a new complaint about substance abuse by Parents and about potential domestic abuse, that Parents fled during that subsequent investigation, and that the Department had not been able to locate Mother since she fled. The caseworker testified that Mother had not addressed the drug-use and domestic-violence safety concerns identified by the Department and that termination of Mother's rights was in Michael's best interest because she had no relationship with him, did not show that she could provide a safe or stable home, and did not complete her services.

When discussing Michael, the caseworker explained that he had been in a foster home since November 2021, was "doing great" in the placement, was "well bonded" with the foster parents, recognized them as his caregivers, and went to them for support. Similarly, the caseworker stated that the foster parents met all his physical and medical needs. Next, the caseworker explained that the foster parents are licensed to adopt and want to adopt him if Parents' rights were terminated. Further, the caseworker explained that he needs permanency to allow him to live a normal and happy life without Department involvement.

4

After the caseworker finished testifying, a Department caseworker supervisor was called to the stand. In his testimony, the supervisor explained that he was assigned to another case involving Mother recently, that the Department was investigating allegations that Mother used controlled substances in December 2022, that Mother did not cooperate with the investigation, and that the Department could not locate Mother after exhausting all possible efforts.

The Court Appointed Special Advocate ("CASA") volunteer in this case testified that she had been assigned to the case in January 2022, that the safety concerns at the beginning of the case involved substance abuse and domestic violence between Father and Mother, and that Parents never addressed those concerns. The CASA explained that she met with Parents multiple times between March 2022 and October 2022 during visits with Michael. When describing the visits, the CASA related that Parents ended eight of the ten visits early after Michael started crying, that Mother did not play with Michael, and that Michael looked at Parents as strangers. Further, the CASA recalled that she became concerned after noticing during the first visit that Mother had bruising on her arm. Additionally, the CASA explained that during the next visit she asked if Parents were still together, that Father said yes, and that Mother shook her head no while standing behind Father. When discussing how Mother answered the question out of Father's view, the CASA explained that it was concerning because of the power dynamics that can be at play in domestic-abuse situations. The CASA related that she was unable to get in touch with Mother after October 3, 2022, despite repeated texting and calling.

Additionally, the CASA testified that the Department initially placed Michael with Father's brother under the terms of a safety plan but later removed him after learning that the safety plan had not been complied with. After the Department discovered that there were no

5

other viable family-placement options, the Department placed Michael with the foster parents. When discussing the foster parents, the CASA said that she had no concerns about Michael's placement with them and that the foster parents wanted to adopt him. Additionally, she related that it was in Michael's best interest to have Mother's rights terminated because the safety concerns had not been alleviated, because Mother had not completed her services, because Mother inconsistently visited with Michael, because Mother refused to submit to all of the requested drug tests, and because Mother could not be located.

Prior to the witnesses' testifying, the following exhibits were admitted into evidence without objection: the affidavit in support of removal; the temporary order and the permanency-hearing order discussed above; drug-test results for Mother showing positive results for oxycodone in October 2021 and positive results for marijuana in January 2022 and February 2022; drug-test results for Father showing positive results for marijuana in February 2021, January 2022, and February 2022; and Father's affidavit of relinquishment.

After considering the evidence, the trial court determined that termination of Mother's parental rights was in Michael's best interest and that Mother constructively abandoned Michael and failed to comply with the requirements of a court order setting out actions necessary for his return. Accordingly, the trial court terminated Mother's parental rights.

Mother appeals the trial court's termination decree.

## DISCUSSION

In her first issue on appeal, Mother contends that her trial attorney provided ineffective assistance. In her next three issues, Mother asserts that the evidence presented at trial was legally and factually insufficient to support the trial court's determinations that termination

6

of her parental rights was in Michael's best interest and that the requirements for the statutory predicates under subsections 161.001(b)(1)(N) and (b)(1)(O) were met. We will address the sufficiency challenges first before addressing Mother's ineffective-assistance claim. *See In re J.S.*, No. 09-08-00536-CV, 2009 WL 2045199, at *1 (Tex. App.—Beaumont July 16, 2009, no pet.) (mem. op.) (addressing legal-sufficiency issues before addressing lack-of-counsel claims because "if sustained the issues would provide greater relief").

**Legal and Factual Sufficiency**

To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct constituting at least one statutory ground for termination in the Family Code and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. When reviewing a termination order, appellate courts defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that

7

the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding and ascertain "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

*Constructive Abandonment*

The statutory predicate grounds at issue in this case are found in subsections 161.001(b)(1)(N) and (b)(1)(O) of the Family Code. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O). Under the first ground, a trial court may terminate a parent's rights if the parent "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than six months, and" if the following occurred:

> (i) the department has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

*Id.* § 161.001(b)(1)(N). The first element focuses on the Department's conduct, but the second and third elements focus on the parent's conduct. *In re L.E.R.*, 650 S.W.3d 771, 785 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

In her second issue on appeal, Mother concedes that Michael was in the "conservatorship of the Department" for the requisite six-month period and does not dispute that

8

she did not regularly visit or maintain significant contact with Michael. However, she does contend that the evidence was insufficient to establish that the Department made reasonable efforts to return Michael to her care and that she demonstrated an inability to provide Michael with a safe environment. When presenting these arguments, Mother asserts that there was no evidence at the time of the removal that she had consumed any drugs other than the oxycodone that the hospital prescribed when she gave birth to Michael. Although Mother acknowledges that drug-test results showed she tested positive for marijuana after the removal, she contends that there is no evidence that the use of marijuana harmed or impaired Michael's physical or mental well-being or resulted in his being abused or neglected. Moreover, Mother suggests that the Department's decision to require Mother to complete a list of services was not a reasonable effort to return Michael to her custody because the only evidence of concerning behavior "stemmed from taking the medications prescribed while hospitalized."

In reviewing the evidence regarding the efforts to return a child, appellate courts focus on the Department's efforts, not the parent's efforts. *See* Tex. Fam. Code § 161.001(1)(N)(i). "Generally, implementation of a family service plan by [the Department] is considered a reasonable effort to return the child to the parent." *See In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). As set out above, the Department developed a service plan for Mother, and the trial court ordered that Mother complete services as part of the reunification process. Moreover, when Mother stopped communicating with the Department, stopped attending visits with Michael, and failed to comply with the terms of the service plan, the Department caseworker repeatedly tried to reach Mother by going to her home, calling her, emailing her, texting her, and calling her attorney. Additionally, when Michael was initially removed, the Department made attempts to place him

9

with a family member before placing him in foster care when no other viable family options were available. *See In re L.C.M.*, 645 S.W.3d 914, 922 (Tex. App.—El Paso 2022, no pet.) (determining that "the Department's efforts to place the child with relatives constitutes legally and factually sufficient evidence that reunification was attempted"); *see also In re G.C.S.*, 657 S.W.3d 114, 132 (Tex. App.—El Paso 2022, pet. denied) (noting that returning-child-to-parent element does not necessarily require proof that child was physically delivered to parent).

"Based on the existence of a service plan" as well as testimony that the caseworker "made repeated attempts to communicate with" Mother through various means and that the Department attempted a family placement, "the trial court could have resolved any dispute about the evidence in favor of its finding that [the Department] made reasonable efforts to return the child." *See C.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00229-CV, 2017 WL 3471072, at *5 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.).

Turning to the final challenged element—whether Mother demonstrated an inability to provide Michael with a safe environment—we note that although Mother asserts that the only evidence concerning any drug use around the time of removal showed that she tested positive for a drug that was prescribed to her by the hospital, other evidence supported a determination that Mother demonstrated an inability to provide Michael with a safe environment. For example, the removal affidavit admitted into evidence asserted that the Department initially became involved in this case after a hospital reported that Mother tested positive for amphetamines when giving birth to Michael. *Cf. A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 790 n.2 (Tex. App.—Austin 2023, no pet.) (explaining that trial court cannot consider allegations in removal affidavit in review of evidence if removal affidavit *is not*

10

admitted into evidence). During that stay at the hospital, Mother and Father got into disputes requiring intervention by hospital security.

When Mother and Father took Michael to the hospital a few weeks later, the hospital staff reported to the Department that they believed that Mother was using illegal substances and could not properly care for Michael after observing her behavior indicating that she was in an altered state, including her hallucinating that Parents and Michael had parasites on their skin. Once the Department investigator arrived, the investigator had difficulty waking Mother up and found her asleep on a couch with her arm draped dangerously over Michael's face.

In addition, although Mother did submit to some drug testing, she did not submit to all of the required drug testing, and "the trial court could infer . . . that Mother's test results would have been positive if she had submitted to testing" on the missed occasions. *See In re A.O.*, No. 05-21-00789-CV, 2022 WL 620631, at *7 (Tex. App.—Dallas Mar. 3, 2022, pet. denied) (mem. op.). Moreover, as set out above, Mother stopped responding to communications from the Department, including ones in which the caseworker went to her home, and did not inform the Department about her decision to move. *See In re M.V.G.*, 440 S.W.3d 54, 62 (Tex. App.—Waco 2010, no pet.) (noting that Department employee visited home multiple times but that no one answered when considering whether parent demonstrated ability to provide safe environment).

Additionally, Mother failed to complete therapy and the parenting classes as required, and there is no indication that Mother had steady housing and employment at the time of trial. *See In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (attending only half of her parenting classes, lacking steady housing and employment, and missing

11

opportunity for counseling and psychological evaluation, among other factors, demonstrated parent's inability to provide child with safe environment). Moreover, the evidence established that Mother only attended ten visits with Michael despite having a weekly visitation date, that Mother ended most of the visits early when Michael cried, that Mother did not play with Michael, and that Mother stopped visiting entirely nearly five months before trial. *Cf. In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) (noting in analysis regarding Mother's ability to provide safe environment that she "dropped out of touch with CPS for several months"). Further, evidence was presented at trial demonstrating that Mother stopped communicating with the Department and moved in an effort not to cooperate with another Department investigation also addressing concerns about drug use and domestic violence after Mother gave birth to another child.

Accordingly, the trial court could have resolved any factual disputes in favor of its determination that Mother failed to establish her ability to provide Michael with a safe environment. *See In re J.J.O.*, 131 S.W.3d at 630; *see also In re G.P.*, 503 S.W.3d 531, 534 (Tex. App.—Waco 2016, pet. denied) (explaining that "[b]y not providing the Department with any information about her living or employment circumstances, failing to make child support payments, failing to seek out and accept counseling services, refusing to take required drug tests, and failing to even maintain contact with [the child], the trial court could have reasonably concluded that [the parent] failed to provide [the child] with a safe environment").

After considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's findings that Mother constructively abandoned Michael. For these reasons, we overrule Mother's second issue on appeal. Because only one predicate violation under subsection

161.001(b)(1) is necessary to support a termination judgment, we need not address Mother's third issue challenging the sufficiency of the evidence supporting the trial court's finding that she failed to comply with an order setting out the steps necessary for her to obtain the return of Michael.  *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re S.L.*, 421 S.W.3d 34, 37 (Tex. App.—Waco 2013, no pet.).

*Best Interest*

In her fourth issue on appeal, Mother contends that the evidence was legally and factually insufficient to establish that it was in Michael's best interest that her parental rights be terminated.  More specifically, Mother asserts that the evidence regarding Michael's best interest was limited to the caseworker's testimony that Michael did not have a relationship with Mother and Father, that Mother and Father could not provide him with a stable and safe home, and that Mother and Father had not addressed the concerns regarding domestic violence and drug use and to the CASA's testimony that Parents' rights should be terminated because the concerns that initiated the case had not been alleviated.  Based on the preceding, Mother contends that this evidence was insufficient to support the trial court's best-interest determination.  *See* Tex. Fam. Code § 153.131 (noting that there is rebuttable presumption that parent be appointed as managing conservator).

The determination regarding whether termination is in a child's best interest "is child centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631.  It is guided by multiple non-exclusive factors, including the following: (1) the child's wishes, (2) the child's physical and emotional needs, (3) the physical and emotional danger to the child now and in the future, (4) the parental abilities of the people seeking custody,

13

(5) programs available to help those people, (6) the plans for the child by those people or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions indicating that the parent-child relationship is improper, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in the child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). "While no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest." *Id.* Evidence pertaining to a statutory ground for termination may also be probative of the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* "Further, the amount of contact between the parent and child and the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest." *Id.* Appellate courts may "measure a parent's future conduct by his or her past conduct to aid in determining whether termination of the parent-child relationship is in the best interest of the child." *See In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.).

Although Michael was too young to testify regarding his desires for placement, *see In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio

14

Mar. 4, 2020, no pet.) (mem. op.) (explaining that three-year-old child was too young to express desires), we do note that Michael was removed from Mother's custody shortly after his birth, bonded with the foster parents, and recognized the foster parents as his caregivers, *see In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied) (noting that "[w]hen children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent" (quoting *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.))).

Regarding Michael's emotional and physical needs and the emotional and physical danger to him, his basic needs include food, clothing, shelter, regular medical and dental care, and a safe and nurturing home. *See In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). No evidence was introduced regarding Mother's paying child support. Moreover, because Mother did not respond to the Department's communication attempts and stopped participating in the case, no evidence was introduced concerning her employment status, the safety and suitability of her current home, and her plan to provide for Michael's basic needs. *See J.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00054-CV, 2022 WL 2182615, at *10 (Tex. App.—Austin June 17, 2022, pet. denied) (mem. op.) (noting that because parent did not communicate or respond to Department's communications, Department could not "assess whether his residence would be appropriate for young children or whether he would be able to provide his sons with stable support"); *In re J.L.G.*, No. 06-16-00087-CV, 2017 WL 1290895, at *6 (Tex. App.—Texarkana Apr. 6, 2017, no pet.) (mem. op.) (emphasizing in best-interest analysis that parent did not have plan to provide child with safe and stable home); *see also In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503,

15

at *9 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.) (stating that "[t]he trial court was entitled to compare Father's lack of plans to the Department's plan in considering the best interests of the children"). Importantly, Mother stopped attending visits and stopped participating in the case months before trial and did not attend trial or provide any excuse for not attending. *See In re A.J.D.-J.*, __ S.W.3d __, No. 01-22-00724-CV, 2023 WL 2655736, at *8 (Tex. App.—Houston [1st Dist.] Mar. 28, 2023, no pet.) (noting that "when a parent fails to attend trial in a parental-termination case without a valid excuse for his or her failure to do so, the factfinder may reasonably infer that the parent is indifferent to the outcome").

Additionally, the removal affidavit stated that Mother tested positive for amphetamines when she gave birth to Michael before later testing positive for opioids prescribed by the hospital and displayed behavior consistent with drug use in the following weeks, and Mother did not submit to all of the required drug testing and tested positive for marijuana during two of the tests that she took. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that parental drug use is relevant to best-interest determination). Along those lines, after Mother gave birth to another child following the removal in this case, the Department received another report concerning Mother's use of illegal drugs and about domestic violence between Mother and Father. *In re J.G.*, 2020 WL 3410503, at *7 (explaining that "[t]he trial court was free to measure Father's potential future conduct in providing for the emotional and physical needs of the children based on Father's past conduct"). Moreover, other than completing one of the four OSAR referrals and submitting to some drug tests, Mother did not comply with the requirements of her service plan. *See In re J.M.T.*, 519 S.W.3d 258, 269-70 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (emphasizing in best-interest analysis that parent "failed to complete all of the tasks and services required in his service plan"); *see also*

16

*In re A.J.D.-J.*, 2023 WL 2655736, at *6 (observing that "when a parent does not try to abide by the plan, the factfinder may reasonably infer the parent is indifferent to the goal of family reunification").

Further, the caseworker testified that Michael was doing well in his placement with the foster parents, that the foster parents were the only parents Michael has known, and that the foster parents met all of his physical and medical needs, and the CASA explained that Michael was placed with the foster parents when he was less than a month old. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *17 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering in best-interest analysis evidence of children's doing well in placement with foster parents, who met children's needs). In contrast, the CASA related that Mother only attended ten visits with Michael since his removal, that she ended eight of the visits early when he started crying, and that she did not play with him. In addition, the caseworker related that the foster parents have obtained a license to adopt and plan to adopt Michael if Parents' rights were terminated. *See D.O. v. Texas Dep't of Hum. Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ) (observing that best-interest determination may consider whether termination would allow adoption to occur), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002). Similarly, the caseworker emphasized that Michael needed permanency to allow him to live a happy life without the Department's being involved, and the CASA testified that it was in Michael's best interest to have Mother's rights terminated. *See In re S.J.R.-Z.*, 537 S.W.3d at 695 (observing that "establishing a stable, permanent home for a child is a compelling interest for the government" (quoting *Dupree v. Texas Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ))).

17

After considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in Michael's best interest. Accordingly, we overrule Mother's fourth issue on appeal.

**Effective Assistance of Counsel**

In her first issue on appeal, Mother contends that her appointed trial attorney provided ineffective assistance. As support, Mother highlights that her attorney did not make any objections to the admission of the six exhibits offered by the Department, waived making an opening argument, did not cross-examine the Department's three witnesses, did not call any witnesses, did not make a closing argument, and made no objection to the trial court's taking judicial notice of its file. Moreover, Mother highlights that although her attorney included in her original answer the defense that she made a good-faith effort to comply with the order setting out actions needed to obtain the return of Michael and that her failure to comply was not her fault, her attorney did not present any evidence or make any argument regarding that defense. Similarly, Mother emphasizes that her attorney did not ask any questions regarding the alleged drug use and domestic violence, including asking questions about how Mother had been prescribed opiates while in the hospital and about what harm Michael experienced as a result of the alleged drug use. Further, Mother asserts that her attorney did not undermine the reasonableness of the service plan requirements pertaining to drug use and domestic violence on the ground that those requirements targeted problems that "did not exist." Additionally, Mother highlights that her attorney failed to argue that termination was not proper for failure to comply with a court order because the governing statute

requires proof that the child was removed for abuse or neglect, which Mother contends did not occur in this case. *See* Tex. Fam. Code § 161.001(b)(1)(O). In light of the preceding, Mother insists that her trial attorney failed to comply with the statutory requirement obligating attorneys representing parents to become familiar with and implement the American Bar Association's standards of practice. *See id.* § 107.0131(a)(1)(I); *see also American Bar Ass'n Standards of Prac. for Att'ys Representing Parents in Abuse and Neglect Case,* www.americanbar.org/content/dam/aba/administrative/child_law/aba-parent-rep-stds.pdf (last visited June 19, 2023) (listing obligations for attorneys representing parents, including preparing and making objections, presenting and cross-examining witnesses, and requesting opportunity to make opening and closing argument). Further, Mother contends that her attorney's inactions constructively denied her the assistance of counsel and that this denial is presumptively prejudicial. *See United States v. Cronic*, 466 U.S. 648, 659 (1984).

The statutory right to counsel in parental-rights termination cases includes, as a matter of due process, the right to effective counsel. *C.S.F. v. Texas Dep't of Fam. & Protective Servs.*, 505 S.W.3d 618, 619 (Tex. 2016). Proving ineffective assistance of counsel requires showing: (1) commission of errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We must determine "whether counsel's defective performance caused harm; in other words, whether 'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *Id.* at 549-50 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "Thus, an

ineffective assistance of counsel claim requires a showing of a deficient performance by counsel so serious as to deny the defendant a fair and reliable trial." *In re J.O.A.*, 283 S.W.3d 336, 342 (Tex. 2009). An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim. *Lockwood v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00062-CV, 2012 WL 2383781, at *5 (Tex. App.—Austin June 26, 2012, no pet.) (mem. op.). The parent has the burden to prove by a preponderance of the evidence that counsel was ineffective. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 707 (Tex. App.—Austin 2019, pet. denied).

"With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *In re M.S.*, 115 S.W.3d at 545. "[C]ounsel's performance falls below acceptable levels of performance when the 'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim App. 1983)). "In this process, we must give great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). "The challenged conduct will constitute ineffective assistance only when 'the conduct was so outrageous that no competent attorney would have engaged in it.'" *In re D.T.*, 625 S.W.3d 62, 74 (Tex. 2021) (quoting *In re M.S.*, 115 S.W.3d at 545). "Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." *In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.). "In a parental-rights termination case where the parent asserts on appeal the ineffective assistance of trial

20

counsel, but nothing in the record indicates trial counsel's reasons or strategies for the complained-of conduct, the lack of a record is practically always fatal to the parent's appellate issue." *In re K.K.*, No. 10-04-00303-CV, 2006 WL 561820, at *3 (Tex. App.—Waco Mar. 8, 2006, no pet.) (mem. op.).

The standard of review is more deferential to counsel's actions when the claim is made for the first time on appeal because the reasonableness of counsel's choices typically involves facts not appearing in the appellate record. *In re J.J.*, 647 S.W.3d 524, 530 (Tex. App.—Texarkana 2022, no pet.). "When the record is silent regarding trial counsel's reasons for his actions, we may not speculate to determine whether trial counsel is ineffective." *In re L.D.L.H.*, No. 04-15-00146-CV, 2015 WL 6507834, at *4 (Tex. App.—San Antonio Oct. 28, 2015, pet. struck) (mem. op.). "Thus, when the record is silent regarding counsel's reasons for his conduct," as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *In re S.L.*, 188 S.W.3d at 395. Stated another way, if counsel "may have acted in accordance with a plausible strategy," we will not find counsel's conduct deficient. *See In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

As an initial matter, we emphasize that the record does not contain any information regarding Mother's trial attorney's decision not to engage in the actions Mother asserts she should have, and perhaps as importantly, the record does indicate that Mother's attorney was unable to have any interaction with or direction from Mother because Mother was evading communication in an effort to avoid another investigation. *Cf. Guzman v. State*, No. 04-08-00656-CR, 2009 WL 2413749, at *3 (Tex. App.—San Antonio Aug. 5, 2009, no pet.) (mem. op., not designated for publication) (determining that defendant was not deprived of

effective assistance where record showed that he refused to cooperate with attorney's efforts to represent him). Moreover, although Mother's trial counsel did not object to the trial being held without Mother being present, the evidence presented at trial demonstrated that Mother was not responding to communications, and her attorney could have strategically decided that the case should proceed to avoid Mother being called as a witness or possibly to avoid the Department's obtaining and presenting more damaging evidence. *See In re L.D.L.H.*, 2015 WL 6507834, at *4.

Additionally, the decisions regarding whether to waive an opening statement or make a closing argument "are inherently strategic decisions." *In re T.N.J.*, No. 13-22-00553-CV, 2023 WL 2182421, at *3 (Tex. App.—Corpus Christi-Edinburg Feb. 23, 2023, no pet.) (mem. op.). In this case, the Department gave a short opening statement identifying the grounds for termination without providing any detail or argument addressing why termination was warranted, and Mother's attorney could have reasonably concluded that under the circumstances it was better to forgo making an opening statement. *See id.* (noting that waiving opening argument can be tactical decision because it prevents opposing party from getting preview of strategy). Relatedly, by the time the decision regarding whether to present a closing argument had to be made, evidence was presented establishing that Mother only attended a few visits with Michael during the last sixteen months, had intentionally stopped communicating with the Department and stopped attending visits with Michael in the five months leading up to trial, and had complied with few of the service requirements, and Mother's attorney could have reasonably concluded that any attempt to justify those actions would ring hollow and merely highlight those actions, particularly in the circumstances here where the Department made a short closing argument and where any closing provided by Mother's attorney might have encouraged a more substantial closing from the attorney ad litem for Michael. *See Yarborough v. Gentry*, 540

22

U.S. 1, 6 (2003) (noting that in some circumstances it makes "sense to forgo closing argument altogether"); *see also Forge v. State*, No. 13-13-00120-CR, 2013 WL 7864083, at *4 (Tex. App.—Corpus Christi-Edinburg Dec. 5, 2013, no pet.) (mem. op., not designated for publication) (noting that defense attorney may have declined to assert right to make closing argument because that would have resulted in State's invoking its right to make closing argument).

Like decisions regarding whether to make or waive opening statements and closing arguments, decisions regarding the cross-examination of witnesses are "inherently a matter of trial strategy." *See Lansink v. State*, No. 01-12-00121-CR, 2014 WL 690291, at *3 (Tex. App.—Houston [1st Dist.] Feb. 20, 2014, no pet.) (mem. op., not designated for publication). "A decision not to cross-examine a witness can frequently be considered sound trial strategy." *Id.* "Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005). In this case, Mother's attorney may have made the strategic decision not to cross-examine the witnesses, including on the topics of drug use and domestic violence, "fearing adverse effects from such examination or fearing that [s]he may inadvertently introduce damaging evidence," particularly when the attorney received no input from Mother. *See Castillo v. State*, No. 13-10-00317-CR, 2011 WL 3853939, at *10 (Tex. App.—Corpus Christi-Edinburg Aug. 31, 2011, no pet.) (mem. op., not designated for publication).

Concerning Mother's claims regarding her attorney's failure to call witnesses, a decision regarding whether to call witnesses is a strategic decision "involving weighing risks and benefits of testimony." *See Jones v. State*, No. 05-19-01282-CR, 2021 WL 194107, at *3 (Tex. App.—Dallas Jan. 20, 2021, no pet.) (mem. op., not designated for publication). Moreover, the

23

failure to call witnesses "does not constitute ineffective assistance of counsel without showing both that the witness[es were] available to testify, and that [their] testimony would have benefitted" the party claiming ineffective assistance. *Id.* Here, although Mother highlights that her attorney did not call witnesses, she does not specify what witnesses should have been called or how their testimony would have helped. Moreover, as set out above, Mother's attorney could have determined that it was better for the case to proceed without Mother's testifying. Mother's attorney also would have likely needed Mother's input as to what witnesses might have helped her case, but Mother chose not to participate in the proceedings.

Turning to Mother's assertion that trial counsel improperly failed to object to the trial court's taking judicial notice of its file, we note that trial courts are allowed to take judicial notice of their own orders and records, *see In re R.S.D.*, 446 S.W.3d 816, 820 n.4 (Tex. App.—San Antonio 2014, no pet.) (explaining that "a court may take judicial notice that a pleading has been filed in the case, that it has signed an order, or of the law of another jurisdiction"); *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.) (noting that trial court may "take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed"), and Mother's attorney could have reasonably determined that it would have been futile to object, *see Wood v. State*, 4 S.W.3d 85, 91 (Tex. App.—Fort Worth 1999, pet. ref'd).

Regarding the admission of the State's exhibits, Mother's trial attorney may have elected not to object to the admission of the temporary order and permanency-hearing order setting out the requirements for the return of Michael and stating that Mother did not appear for the permanency hearing because testimony regarding those requirements and Mother's failure to appear would likely be admitted through the testimony of the Department's caseworker and

24

because the orders were already in the court's file, of which the court could take judicial notice. Turning to the removal affidavit and Mother's drug tests, Mother's attorney could have reasonably concluded that the admission of those exhibits could have helped Mother's case. *Cf. Phuthavong v. State*, No. 01-17-00420-CR, 2018 WL 6215992, at *5 (Tex. App.—Houston [1st Dist.] Nov. 29, 2018, pet. ref'd) (mem. op., not designated for publication) (determining that failure to object to admission of exhibits was not ineffective assistance where it was "possible that trial counsel strategically chose not to object because the [exhibits] helped the defense highlight contradictions"). As set out previously, the removal affidavit referenced statements from hospital staff relating that Mother had been prescribed an opiate around the time of Michael's birth, and the drug test result from around that time was consistent with the hospital staff's statement but also showed negative results for all of the other drugs tested. Similarly, although the two other drug tests showed positive results for marijuana, they showed negative results for all of the other drugs tested, including the drug leading to the initiation of this case. Moreover, the final two exhibits—Father's drug-test results and affidavit of relinquishment—did not pertain to Mother.

Concerning the defenses that Mother suggests her trial attorney should have presented, we note that Mother's attorney initially suggested in an answer that termination for failure to comply with a court order was not authorized in this case due to the defense set out in subsection 161.001(d), which provides that termination may not be ordered if the parent establishes that she made a good-faith effort to comply with the provisions of a court order and that the failure to comply was not attributable to any fault of the parent. *See* Tex. Fam. Code § 161.001(d). Mother's attorney could have concluded based on information she learned in the months between the filing of the answer and trial and on the evidence presented at trial, that the

25

defense did not apply and made the strategic decision not to pursue it. *See Magro-Malo v. State*, No. 08-08-00027-CR, 2009 WL 1717813, at *2 (Tex. App.—El Paso June 17, 2009, no pet.) (op., not designated for publication) (determining that trial attorney's decision not to pursue defense was not outside zone of reasonable assistance after reasonably concluding that facts of case did not raise defense); *see also M.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00533-CV, 2021 WL 1418977, at *9 n.5 (Tex. App.—Austin Apr. 14, 2021, pet. denied) (mem. op.) (explaining that evidence did not establish that Mother should be excused from compliance due to subsection 161.001(d) where Mother refused to engage in services and did not testify regarding her attempts to comply).

Similarly, Mother contends that her trial attorney should have but did not argue that termination was not warranted under subsection 161.001(b)(1)(O) for failure to comply with a court order because that provision requires that the child be initially removed for abuse or neglect, which Mother asserts did not happen, and because the service requirements incorporated into the order were based on alleged drug use and domestic violence that she contends did not occur. However, as with her previous assertion, Mother's trial attorney could have determined based on the evidence—including evidence indicating that Mother used amphetamines, exhibited an altered and hallucinatory state while caring for Michael, draped her arm dangerously over Michael's face, was involved in more than one incident with Father at the hospital requiring intervention by security, failed to submit to the required drug tests, tested positive for drugs, and behaved in a manner consistent with being abused and had bruises—that Michael was removed for abuse or neglect and strategically chose not to pursue the defensive theories Mother asserts here. *See In re J.B.*, No. 02-18-00173-CV, 2018 WL 4626427, at *5-6 (Tex. App.—Fort Worth Sept. 27, 2018, no pet.) (mem. op.) (per curiam) (determining that abuse-or-neglect element

26

of subsection 161.001(b)(1)(O) was satisfied, in part, by evidence of parent's drug use and failure to test); *In re C.C.*, No. 10-16-00129-CV, 2016 WL 6808944, at \*11 (Tex. App.—Waco Nov. 16, 2016, no pet.) (mem. op.) (concluding that subsection 161.001(b)(1)(O) can be satisfied by risk of abuse or neglect, which applied to removal of mother's children because mother tested positive for methamphetamine shortly before removal, had history of drug abuse, and exposed children to domestic violence and drugs); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (noting factfinder can infer drug use from refusal to drug test).

On this undeveloped record, we cannot conclude that trial counsel's performance fell outside the wide range of reasonable professional assistance or was "so grossly deficient as to render [the] proceedings fundamentally unfair." *See In re M.S.*, 115 S.W.3d at 545 (quoting *Brewer*, 649 S.W.2d at 630); *see also Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). Accordingly, we overrule Mother's first issue.

## CONCLUSION

Having overruled Mother's issues on appeal, we affirm the trial court's final decree terminating her parental rights to Michael.

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Jones[*]

Affirmed

Filed:   June 21, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).